1  Ben F. Pierce Gore (SBN 128515)
2  PRATT & ASSOCIATES
   1901 S. Bascom Avenue, Suite 350
3  Campbell, CA  95008
   Telephone: (408) 429-6506
4  Fax:  (408) 369-0752
   pgore@prattattorneys.com
5
   (Co-counsel listed on signature page)
6
   *Attorneys for Plaintiff*
7

**ADR**

**Filed**

APR 1 3 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

**E-filing**



8
9              IN THE UNITED STATES DISTRICT COURT

10           FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                      SAN JOSE DIVISION

12                   CV12-01862                         PSG

13  LEON KHASIN, individually and on          Case No.
    behalf of all others similarly situated,
14                                            **CLASS ACTION AND REPRESENTATIVE
                   Plaintiff,                 ACTION**
15
    v.                                        **COMPLAINT FOR DAMAGES AND
16                                            EQUITABLE AND INJUNCTIVE RELIEF**
    THE HERSHEY COMPANY,
17                                            **JURY TRIAL DEMANDED**
                   Defendant.
18
19
20          Plaintiff Leon Khasin ("Plaintiff"), through his undersigned attorneys, brings this lawsuit

21  against Defendant (hereinafter, "Hershey" or "Defendant") as to his own acts upon actual

22  knowledge, and as to all other matters upon information and belief.  In order to remedy the harm

23  arising from Defendant's illegal conduct, which has resulted in unjust profits, Plaintiff brings this

24  action on behalf of a class of California consumers who purchased Hershey (1) Special Dark

25  Chocolate Bars, (2) Special Dark Kisses, (3) Special Dark Cocoa and (4) Cocoa ("Misbranded

26  Food Products") within the last four years.

27
28

*Class Action Complaint*

**INTRODUCTION**

1.      Every day, millions of Americans purchase and consume packaged foods.  Identical federal and California laws require truthful, accurate information on the labels of packaged foods. This case is about a company that flouts those laws.  The law, however, is clear: misbranded food cannot legally be manufactured, held, advertised, distributed or sold.  Misbranded food is worthless as a matter of law, and purchasers of misbranded food are entitled to a refund of their purchase price.

2.      Defendant is a multinational corporation with over 70 brands of products. Hershey's website states, "The Hershey Company (NYSE: HSY) is the largest producer of quality chocolate in North America and a global leader in chocolate and sugar confectionery. Headquartered in Hershey, Pa., The Hershey Company has operations throughout the world and more than 12,000 employees. With revenues of more than $5 billion [ . . . ] Hershey is a leader in the fast-growing dark and premium chocolate segment, with such brands as *HERSHEY SPECIAL DARK* and *HERSHEY EXTRA DARK*."   Hershey products typically command premium prices compared to alternative options.

3.      Hershey makes heath nutrient claims directly on the packages of Misbranded Food Products.  For example, the package front panel of certain Hershey Special Dark Kisses states that "Cocoa is Natural Source of Flavanol Antioxidants."  It states:



4.      The back panel further touts, "The natural antioxidants found in teas and certain fruits like berries and grapes can also be found in Hershey Kisses Special Dark Chocolates."  *See, e.g.* Hershey Kisses Special Dark mildly sweet chocolate classic bag 12oz (340g).  Many, if not all, of Hershey's chocolate or cocoa products have undergone the process of alkanization or "Dutching." Which reduces or virtually eliminates the flavanol content of the chocolate or cocoa.

5.      In promoting the health benefits of its products, including its chocolate and cocoa products, Hershey adopted a "Code of Ethical Business Conduct."  These principals are Hershey's "Commitment to Consumers" and include the following provisions:

> We must ensure that the products we produce are safe, comply with applicable laws and meet our standards.
>
> [ . . . ]
>
> MARKET OUR PRODUCTS ETHICALLY
>
> We must never make misleading or false statements about our products or those of our competitors
>
> We truthfully market, promote and advertise our products. This is consistent with our commitment to acting honestly in all our business affairs. All descriptions of our products, services and prices must be truthful and accurate, meaning we must:
>
> > o   Make only fair, fact-based comparisons between our products and those of our competitors
> > o   Never misstate the facts or mislead consumers through Company advertisements, labeling, packaging or promotions.
>
> http://www.thehersheycompany.com/assets/pdfs/hersheycompany/English_txt.pdf.

6.      If a manufacturer is going to make a claim on a food label, the label must meet certain legal requirements that help consumers make informed choices and ensure that they are not misled.  As described more fully below, Defendant has made, and continues to make, false and deceptive claims in violation of federal and California laws that govern the types of representations that can be made on food labels.  These laws recognize that reasonable consumers are likely to choose products claiming to have a health or nutritional benefit over otherwise

similar food products that do not claim such benefits. More importantly, these laws recognize that the failure to disclose the presence of risk-increasing nutrients is deceptive because it conveys to consumers the net impression that a food makes only positive contributions to a diet, or does not contain any nutrients at levels that raise the risk of diet-related disease or health-related condition.

7. Under federal and California law, Defendant's Misbranded Food Products cannot be legally held or sold. These laws recognize that reasonable consumers are likely to choose products claiming to have a health or nutritional benefit over otherwise similar food products that do not claim such benefits.

8. Identical federal and California laws regulate the content of labels on packaged food. The requirements of the federal Food Drug & Cosmetic Act ("FDCA") were adopted by the California legislature in the Sherman Food Drug & Cosmetic Law (the "Sherman Law"). California Health & Safety Code § 109875, *et seq.* Under FDCA section 403(a), food is "misbranded" if "its labeling is false or misleading in any particular," or if it does not contain certain information on its label or its labeling. 21 U.S.C. § 343(a).

9. Under the FDCA, the term "false" has its usual meaning of "untruthful," while the term "misleading" is a term of art. Misbranding reaches not only false claims, but also those claims that might be technically true, but still misleading. If any one representation in the labeling is misleading, then the entire food is misbranded, nor can any other statement in the labeling cure a misleading statement. "Misleading" is judged in reference to "the ignorant, the unthinking and the credulous who, when making a purchase, do not stop to analyze." *United States v. El-O-Pathic Pharmacy*, 192 F.2d 62, 75 (9th Cir. 1951). Under the FDCA, it is not necessary to prove that anyone was actually misled.

10. Defendant has made, and continues to make, food label claims that are prohibited by federal and California law. Under federal and California law, Defendant's Misbranded Food Products cannot legally be manufactured, advertised, distributed, held or sold. Defendant's false and misleading labeling practices stem from their global marketing strategy. Thus, the violations and misrepresentations are similar across product labels and product lines.

11.     Defendant's website also makes unlawful contentions regarding the Misbranded Food Products. Defendant has made, and continues to make unlawful, unapproved, new drug claims, including antioxidant claims that are prohibited by law.  Defendant makes unapproved, new drug claims by using scientific publications commercially to promote the product to consumers.

12.     Like the illegal health claims of TCHO Ventures, Inc. ("TCHO"), cited *infra*, the health claims stated by Defendant establish that its Misbranded Food Products are drugs under section 201(g)(1)(B) of 21 U.S.C. § 321(g)(1)(B), because they are intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease. Hershey's products are not generally recognized as safe and effective for the above referenced uses and, therefore, the products are "new drugs" as defined by section 201(p) of 21 U.S.C. § 321(p). A new drug may not be legally marketed in the United States without prior approval from FDA as described in section 505(a) of 21 U.S.C. § 355(a).

13.     Defendant recognizes that health claims drive sales, and actively promotes the health benefits of chocolate and cocoa, including flavonoids/antioxidants:

> It's more than wishful thinking — chocolate can be good for you. Studies show that eating chocolate, primarily dark chocolate, may contribute to improved cardiovascular health. A source of natural flavanol antioxidants, dark chocolate and cocoa sit in the same good-for-you category as green tea and blueberries. That's because chocolate comes from cacao beans (or cocoa beans), which grow on the cacao tree and are full of natural plant nutrients. Most of the studies to date highlight dark chocolate highlight it because it has the highest percentage of cocoa solids, therefore delivering more flavanol antioxidants.

> The health benefits of high antioxidant foods have taken the scientific world — and the media — by storm. Recent studies suggest that the plant compounds, which act as antioxidants in foods, may reduce the risk of many kinds of illness, from heart disease to cancer. Antioxidants like those found in dark chocolate and cocoa, called flavanols, have also been linked to some of the hallmarks of good cardiovascular health such as enhanced blood flow, healthy cholesterol levels and, in some cases, reduced blood pressure.

> Dark chocolate and cocoa contain cell-protecting flavanol antioxidant compounds. Two tablespoons of natural cocoa have more antioxidant capacity than 3 ½ cups of green tea, ¾ cup of blueberries and 1 1/3 glasses of red wine.

1    http://www.thehersheycompany.com/nutrition-and-wellness/chocolate-

2    101/antioxidants.aspx (emphasis added)

3        14.    Defendant's website also states:

A large number of recent studies have shown that several biomarkers of cardiovascular risk are influenced by flavonoid-rich foods.(8) The flavonoids subclass has been the subject of much research due to their antioxidant activity. While the flavanols, the flavonoids found abundantly in cocoa, can act as antioxidants, they also have other physiologically important properties.

**COCOA IN THE TEST TUBE**

Numerous *in vitro* studies indicate that cocoa flavanols may mitigate risk factors for cardiovascular disease. The addition of dark chocolate to blood samples inhibited LDL oxidation even at low concentrations in the blood.(9-11) Purified cocoa flavanols reduced platelet activation and aggregation in blood in the presence of an activating agent.(12) Cocoa flavanols also led to a decrease in blood clotting and inflammation, not only through direct effects on platelet activation and aggregation, but also by moderating the production of eicosanoids, precursors of the inflammation process.(13)

**COCOA IN THE BODY**

The strong *in vitro* evidence of dark chocolate, cocoa and cocoa components in improving cardiovascular disease risk has led to a number of clinical trials with humans volunteers. Risk factors of interest include: platelet activity and eiscosanoid production, high blood pressure, endothelial function/nitric oxide production and blood cholesterol.

**Platelet activity:** Platelets carry blood clotting factors and are important for wound healing, but in the arterial endothelium, they can aggregate and cause plaques. A decrease in platelet activity is thus favorable to overall cardiovascular health. In one study, after drinking cocoa high in polyphenols, a reduction in platelet surface markers (PAC-1) was found, indicating decreased platelet activation.(14) A separate study showed cocoa consumption decreased the formation of platelet microparticles – which correlates positively with thrombotic, or blood clotting disorders.(14)

http://www.hersheys.com/nutrition-professionals/chocolate/chocolate-health-

nutrition/health.aspx

        15.    Hershey touts direct correlation between dark chocolate consumption and

"significantly reduced blood pressure."

How much dark chocolate do you recommend for people eat each day?

We don't know exactly but we have some studies underway to help determine this. In a study published in the Journal of the American Medical Association a few years ago, eating a small amount of dark chocolate every day for 12 weeks significantly reduced blood pressure in people with slightly elevated blood pressure. The amount of dark chocolate eaten each day was 6.3 grams. This is about the same amount of chocolate as in 1 ½ HERSHEY KISSES Brand SPECIAL DARK Chocolates.

http://www.hersheys.com/nutritionprofessionals/chocolate/Chocolate_FAQ.aspx

**PARTIES**

16.     Plaintiff Leon Khasin is a resident of San Jose, California who purchased Hershey Cocoa, Special Dark Chocolate, Special Dark Kisses and Special Dark Cocoa in California during the four (4) years prior to the filing of this Complaint (the "Class Period").

17.     Defendant The Hershey Company is a Delaware corporation with its principle place of business at 100 Crystal A Drive, Hershey, Pennsylvania.

18.     Defendant is the leading producer of retail chocolate and cocoa food products, including specifically, Hershey Special Dark Chocolate Bars, Special Dark Kisses, Special Dark Cocoa and Cocoa.  Defendant sells its Misbranded Food Products to consumers through grocery and other retail stores as well as direct marketing through its web page throughout California.

**JURISDICTION AND VENUE**

19.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action in which:  (1) there are over 100 members in the proposed class; (2) members of the proposed class have a different citizenship from Defendant; and (3) the claims of the proposed class members exceed $5,000,000 in the aggregate.

20.     The Court has jurisdiction over the California claims alleged herein pursuant to 28 U.S.C. § 1367, because they form part of the same case or controversy under Article III of the United States Constitution.

21.     Alternatively, the Court has jurisdiction over all claims alleged herein pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of $75,000, and is between citizens of different states.

1    22.    The Court has personal jurisdiction over Defendant because a substantial portion

2  of the wrongdoing alleged in this Complaint occurred in California, Defendant is authorized to do

3  business in California, has sufficient minimum contacts with California, and otherwise

4  intentionally avail itself of the markets in California through the promotion, marketing and sale of

5  merchandise, sufficient to render the exercise of jurisdiction by this Court permissible under

6  traditional notions of fair play and substantial justice.

7    23.    Because a substantial part of the events or omissions giving rise to these claims

8  occurred in this District and because the Court has personal jurisdiction over Defendant, venue is

9  proper in this Court pursuant to 28 U.S.C. § 1391(a) and (b).

10                                    **FACTUAL ALLEGATIONS**

11    **A.    Identical California And Federal Laws Regulate Food Labeling**

12    24.    Food manufacturers are required to comply with federal and state laws and

13  regulations that govern the labeling of food products.  First and foremost among these is the

14  FDCA and its labeling regulations, including those set forth in 21 C.F.R. § 101.

15    25.    Pursuant to the Sherman Law, California has expressly adopted the federal

16  labeling requirements as its own and indicated that "[a]ll food labeling regulations and any

17  amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993,

18  or adopted on or after that date shall be the food regulations of this state."  California Health &

19  Safety Code § 110100.

20    26.    In addition to its blanket adoption of federal labeling requirements, California has

21  also enacted a number of laws and regulations that adopt and incorporate specific enumerated

22  federal food laws and regulations.  For example, food products are misbranded under California

23  Health & Safety Code § 110660 if their labeling is false and misleading in one or more

24  particulars; are misbranded under California Health & Safety Code § 110665 if their labeling fails

25  to conform to the requirements for nutrient labeling set forth in 21 U.S.C. § 343(q) and

26  regulations adopted thereto; are misbranded under California Health & Safety Code § 110670 if

27  their labeling fails to conform with the requirements for nutrient content and health claims set

28  forth in 21 U.S.C. § 343(r) and regulations adopted thereto; are misbranded under California

Health & Safety Code § 110705 if words, statements and other information required by the Sherman Law to appear on their labeling are either missing or not sufficiently conspicuous; are misbranded under California Health & Safety Code § 110735 if they are represented as having special dietary uses but fail to bear labeling that adequately informs consumers of their value for that use; and are misbranded under California Health & Safety Code § 110740 if they contain artificial flavoring, artificial coloring and chemical preservatives but fail to adequately disclose that fact on their labeling.

### B.    FDA Enforcement History

27.    In recent years the United States Food and Drug Administration ("FDA") has become increasingly concerned that food manufacturers were disregarding food labeling regulations. To address this concern, the FDA elected to take steps to inform the food industry of its concerns and to place the industry on notice that food labeling compliance was an area of enforcement priority.

28.    In October 2009, the FDA issued a *Guidance For Industry: Letter regarding Point Of Purchase Food Labeling* to address its concerns about front of package labels ("2009 FOP Guidance"). The 2009 FOP Guidance advised the food industry:

> FDA's research has found that with FOP labeling, people are less likely to check the Nutrition Facts label on the information panel of foods (usually, the back or side of the package). It is thus essential that both the criteria and symbols used in front-of-package and shelf-labeling systems be nutritionally sound, well-designed to help consumers make informed and healthy food choices, and not be false or misleading. The agency is currently analyzing FOP labels that appear to be misleading. The agency is also looking for symbols that either expressly or by implication are nutrient content claims. We are assessing the criteria established by food manufacturers for such symbols and comparing them to our regulatory criteria.

> It is important to note that nutrition-related FOP and shelf labeling, while currently voluntary, is subject to the provisions of the Federal Food, Drug, and Cosmetic Act that prohibit false or misleading claims and restrict nutrient content claims to those defined in FDA regulations. Therefore, FOP and shelf labeling that is used in a manner that is false or misleading misbrands the products it accompanies. Similarly, a food that bears FOP or shelf labeling with a nutrient content claim that does not comply with the regulatory criteria for the claim as defined in Title 21 Code of Federal Regulations (CFR) 101.13 and Subpart D of Part 101 is misbranded. We will consider enforcement actions against clear violations of these established labeling requirements. . .

... Accurate food labeling information can assist consumers in making healthy nutritional choices. FDA intends to monitor and evaluate the various FOP labeling systems and their effect on consumers' food choices and perceptions. FDA recommends that manufacturers and distributors of food products that include FOP labeling ensure that the label statements are consistent with FDA laws and regulations. FDA will proceed with enforcement action against products that bear FOP labeling that are explicit or implied nutrient content claims and that are not consistent with current nutrient content claim requirements. FDA will also proceed with enforcement action where such FOP labeling or labeling systems are used in a manner that is false or misleading.

29. The 2009 FOP Guidance recommended that "manufacturers and distributors of food products that include FOP labeling ensure that the label statements are consistent with FDA law and regulations" and specifically advised the food industry that it would "proceed with enforcement action where such FOP labeling or labeling systems are used in a manner that is false or misleading."

30. Despite the issuance of the 2009 FOP Guidance, Defendant did not remove the unlawful and misleading food labeling claims from their Misbranded Food Products.

31. On March 3, 2010, the FDA issued an "Open Letter to Industry from [FDA Commissioner] Dr. Hamburg" (hereinafter, "Open Letter"). The Open Letter reiterated the FDA's concern regarding false and misleading labeling by food manufacturers. In pertinent part the letter stated:

In the early 1990s, the Food and Drug Administration (FDA) and the food industry worked together to create a uniform national system of nutrition labeling, which includes the now-iconic Nutrition Facts panel on most food packages. Our citizens appreciate that effort, and many use this nutrition information to make food choices. Today, ready access to reliable information about the calorie and nutrient content of food is even more important, given the prevalence of obesity and diet-related diseases in the United States. This need is highlighted by the announcement recently by the First Lady of a coordinated national campaign to reduce the incidence of obesity among our citizens, particularly our children.

With that in mind, I have made improving the scientific accuracy and usefulness of food labeling one of my priorities as Commissioner of Food and Drugs. The latest focus in this area, of course, is on information provided on the principal display panel of food packages and commonly referred to as "front-of-pack" labeling. The use of front-of-pack nutrition symbols and other claims has grown tremendously in recent years, and it is clear to me as a working mother that such information can be helpful to busy shoppers who are often pressed for time in making their food selections.

- 9 -
*Class Action Complaint*

As we move forward in those areas, I must note, however, that there is one area in which more progress is needed. As you will recall, we recently expressed concern, in a "Dear Industry" letter, about the number and variety of label claims that may not help consumers distinguish healthy food choices from less healthy ones and, indeed, may be false or misleading.

At that time, we urged food manufacturers to examine their product labels in the context of the provisions of the Federal Food, Drug, and Cosmetic Act that prohibit false or misleading claims and restrict nutrient content claims to those defined in FDA regulations. As a result, some manufacturers have revised their labels to bring them into line with the goals of the Nutrition Labeling and Education Act of 1990. Unfortunately, however, we continue to see products marketed with labeling that violates established labeling standards.

To address these concerns, FDA is notifying a number of manufacturers that their labels are in violation of the law and subject to legal proceedings to remove misbranded products from the marketplace. While the warning letters that convey our regulatory intentions do not attempt to cover all products with violative labels, they do cover a range of concerns about how false or misleading labels can undermine the intention of Congress to provide consumers with labeling information that enables consumers to make informed and healthy food choices. For example:

- Nutrient content claims that FDA has authorized for use on foods for adults are not permitted on foods for children under two. Such claims are highly inappropriate when they appear on food for infants and toddlers because it is well known that the nutritional needs of the very young are different than those of adults.
- Claims that a product is free of trans fats, which imply that the product is a better choice than products without the claim, can be misleading when a product is high in saturated fat, and especially so when the claim is not accompanied by the required statement referring consumers to the more complete information on the Nutrition Facts panel.
- Products that claim to treat or mitigate disease are considered to be drugs and must meet the regulatory requirements for drugs, including the requirement to prove that the product is safe and effective for its intended use.
- Misleading "healthy" claims continue to appear on foods that do not meet the long- and well-established definition for use of that term.
- Juice products that mislead consumers into believing they consist entirely of a single juice are still on the market. Despite numerous admonitions from FDA over the years, we continue to see juice blends being inaccurately labeled as single-juice products.

These examples and others that are cited in our warning letters are not indicative of the labeling practices of the food industry as a whole. In my conversations with industry leaders, I sense a strong desire within the industry for a level playing field and a commitment to producing safe, healthy products. That reinforces my belief that FDA should provide as clear and consistent guidance as possible about food

1
2

labeling claims and nutrition information in general, and specifically about how the growing use of front-of-pack calorie and nutrient information can best help consumers construct healthy diets.

3
4
5
6

I will close with the hope that these warning letters will give food manufacturers further clarification about what is expected of them as they review their current labeling. I am confident that our past cooperative efforts on nutrition information and claims in food labeling will continue as we jointly develop a practical, science-based front-of-pack regime that we can all use to help consumers choose healthier foods and healthier diets.

7
8

    32.    Notwithstanding the Open Letter, Defendant continued to utilize unlawful food labeling claims despite the express guidance of the FDA in the Open Letter.

9
10
11

    33.    In addition to its guidance to industry, the FDA has sent warning letters to industry, including many of Defendant's peer food manufacturers for the same types of unlawful nutrient content claims described above.

12
13
14
15
16

    34.    In these letters the FDA indicated that, as a result of the same type of claims utilized by Defendant, products were in "violation of the Federal Food, Drug, and Cosmetic Act … and the applicable regulations in Title 21, Code of Federal Regulations, Part 101 (21 CFR § 101)" and "misbranded within the meaning of section 403(r)(1)(A) because the product label bears a nutrient content claim but does not meet the requirements to make the claim."

17
18

    35.    The warning letters were hardly isolated as the FDA has issued other warning letters to other companies for the same type of food labeling claims at issue in this case.

19
20
21
22
23

    36.    The FDA stated that the agency not only expected companies that received warning letters to correct their labeling practices but also anticipated that other firms would examine their food labels to ensure that they are in full compliance with food labeling requirements and make changes where necessary. Defendant did not change the labels on its Misbranded Food Products in response to these warning letters.

24
25
26
27
28

    37.    Defendant also continued to ignore the 2009 FOP Guidance which detailed the FDA's guidance on how to make food labeling claims. Defendant ignored this guidance as well and continued to utilize unlawful claims on the labels of its Misbranded Food Products. As such, the Defendant's Misbranded Food Products continue to run afoul of 2009 FOP Guidance as well as federal and California law.

38.     Despite the FDA's numerous warnings to industry, Defendant has continued to sell products bearing unlawful food labeling claims without meeting the requirements to make them.

39.     Plaintiff did not know, and had no reason to know, that the Defendant's Misbranded Food Products were misbranded and bore food labeling claims despite failing to meet the requirements to make those food labeling claims.

### C.     Defendant's Food Products are Misbranded

40.     Pursuant to Section 403 of the FDCA, a claim that characterizes the level of a nutrient in a food is a "nutrient content claim" that must be made in accordance with the regulations that authorize the use of such claims. 21 U.S.C. § 343(r)(1)(A). California expressly adopted the requirements of 21 U.S.C. § 343(r) in § 110670 of the Sherman Law.

41.     Nutrient content claims are claims about specific nutrients contained in a product. They are typically made on the front of packaging in a font large enough to be read by the average consumer. Because these claims are relied upon by consumers when making purchasing decisions, the regulations govern what claims can be made in order to prevent misleading claims.

42.     Section 403(r)(1)(A) of the FDCA governs the use of expressed and implied nutrient content claims on labels of food products that are intended for sale for human consumption. See 21 C.F.R. § 101.13.

43.     21 C.F.R. § 101.13 provides the general requirements for nutrient content claims, which California has expressly adopted. See California Health & Safety Code § 110100. 21 C.F.R. § 101.13 requires that manufacturers include certain disclosures when a nutrient claim is made and, at the same time, the product contains certain levels of unhealthy ingredients, such as fat and sodium. It also sets forth the manner in which that disclosure must be made, as follows:

(4)(i) The disclosure statement "See nutrition information for ___ content" shall be in easily legible boldface print or type, in distinct contrast to other printed or graphic matter, and in a size no less than that required by §101.105(i) for the net quantity of contents statement, except where the size of the claim is less than two times the required size of the net quantity of contents statement, in which case the disclosure statement shall be no less than one-half the size of the claim but no smaller than one-sixteenth of an inch, unless the package complies with §101.2(c)(2), in which case the disclosure statement may be in type of not less than one thirty-second of an inch.

(ii) The disclosure statement shall be immediately adjacent to the nutrient content

claim and may have no intervening material other than, if applicable, other information in the statement of identity or any other information that is required to be presented with the claim under this section (e.g., see paragraph (j)(2) of this section) or under a regulation in subpart D of this part (e.g., see §§101.54 and 101.62). If the nutrient content claim appears on more than one panel of the label, the disclosure statement shall be adjacent to the claim on each panel except for the panel that bears the nutrition information where it may be omitted.

44.     An "expressed nutrient content claim" is defined as any direct statement about the level (or range) of a nutrient in the food (*e.g.*, "low sodium" or "contains 100 calories"). *See* 21 C.F.R. § 101.13(b)(1).

45.     An "implied nutrient content claim" is defined as any claim that: (i) describes the food or an ingredient therein in a manner that suggests that a nutrient is absent or present in a certain amount (*e.g.*, "high in oat bran"); or (ii) suggests that the food, because of its nutrient content, may be useful in maintaining healthy dietary practices and is made in association with an explicit claim or statement about a nutrient (*e.g.*, "healthy, contains 3 grams (g) of fat"). 21 C.F.R. § 101.13(b)(2)(i-ii).

## 1.     Defendant Makes Unlawful Nutrient Content Claims

46.     FDA regulations authorize use of a limited number of defined nutrient content claims. In addition to authorizing the use of only a limited set of defined nutrient content terms on food labels, FDA's regulations authorize the use of only certain synonyms for these defined terms. If a nutrient content claim or its synonym is not included in the food labeling regulations it cannot be used on a label. Only those claims, or their synonyms, that are specifically defined in the regulations may be used. All other claims are prohibited. 21 CFR § 101.13(b).

47.     Only approved nutrient content claims will be permitted on the food label, and all other nutrient content claims will misbrand a food. It should thus be clear which type of claims are prohibited and which are permitted. Manufacturers are on notice that the use of an unapproved nutrient content claim is prohibited conduct. 58 FR 2302. In addition, 21 U.S.C. § 343(r)(2) prohibits using unauthorized undefined terms and declares foods that do so to be misbranded.

48.     In order to appeal to consumer preferences, Defendant has repeatedly made unlawful nutrient content claims about antioxidants and other nutrients that fail to utilize one of the limited defined terms. These nutrient content claims are unlawful because they failed to

1   comply with the nutrient content claim provisions in violation of 21 C.F.R. §§ 101.13 and 101.54,

2   which have been incorporated in California's Sherman Law. To the extent that the terms used to

3   describe antioxidants without a recognized daily values ("DVs") or Reference Daily Intake

4   ("RDI") are deemed to be a synonym for a defined term like "contain" the claim would still be

5   unlawful because, as these nutrients do not have established daily values, they cannot serve as the

6   basis for a term that has a minimum daily value threshold.

7       49.     Similarly, the regulations specify absolute and comparative levels at which foods

8   qualify to make these claims for particular nutrients (*e.g.*, low fat . . . more vitamin C) and list

9   synonyms that may be used in lieu of the defined terms. Certain implied nutrient content claims

10  (*e.g.*, healthy) also are defined. The DVs for nutrients that the FDA has established for nutrition

11  labeling purposes have application for nutrient content claims, as well. Claims are defined under

12  current regulations for use with nutrients having established DVs; moreover, relative claims are

13  defined in terms of a difference in the percent DV of a nutrient provided by one food as compared

14  to another. *See e.g.*, 21 C.F.R. §§ 101.13 and 101.54.

15      50.     Defendant has repeatedly made unlawful nutrient content claims about

16  antioxidants and other nutrients that fail to utilize one of the limited defined terms appropriately.

17  These nutrient content claims are unlawful because they fail to comply with the nutrient content

18  claim provisions in violation of 21 C.F.R. §§ 101.13 and 101.54, which have been incorporated in

19  California's Sherman Law.

20      51.     For example, claims that Hershey products have "more" antioxidants than other

21  foods are unlawful Defendant's products do not meet the minimum nutrient level threshold to

22  make such a claim.

23      52.     The nutrient content claims regulations discussed above are intended to ensure that

24  consumers are not misled as to the actual or relative levels of nutrients in food products.

25  Defendant has violated these referenced regulations. Therefore, Defendant's Misbranded Food

26  Products are misbranded as a matter of federal and California law and cannot be sold or held

27  because they are legally worthless.

28

## 2. **Defendant Makes Unlawful Antioxidant Nutrient Claims**

53.     Federal and California regulations regulate antioxidant claims as a particular type of nutrient content claim. Specifically, 21 C.F.R. § 101.54(g) contains special requirements for nutrient claims that use the term "antioxidant":

> (1)     the name of the antioxidant must be disclosed;

> (2)     there must be an established Reference Daily Intake ("RDI") for that antioxidant, and if not, no "antioxidant" claim can be made about it;

> (3)     the label claim must include the specific name of the nutrient that is an antioxidant and cannot simply say "antioxidants" (*e.g.*, "high in antioxidant vitamins C and E"),[1] *see* 21 C.F.R. § 101.54(g)(4);

> (4)     the nutrient that is the subject of the antioxidant claim must also have recognized antioxidant activity, *i.e.*, there must be scientific evidence that after it is eaten and absorbed from the gastrointestinal tract, the substance participates in physiological, biochemical or cellular processes that inactivate free radicals or prevent free radical-initiated chemical reactions, *see* 21 C.F.R. § 101.54(g)(2);

> (5)     the antioxidant nutrient must meet the requirements for nutrient content claims in 21 C.F.R. § 101.54(b), (c), or (e) for "High" claims, "Good Source" claims, and "More" claims, respectively. For example, to use a "High" claim, the food would have to contain 20% or more of the Daily Reference Value ("DRV") or RDI per serving. For a "Good Source" claim, the food would have to contain between 10-19% of the DRV or RDI per serving, *see* 21 C.F.R. § 101.54(g)(3); and

> (6)     the antioxidant nutrient claim must also comply with general nutrient content claim requirements such as those contained in 21 C.F.R. § 101.13(h) that prescribe the circumstances in which a nutrient content claim can be made on the label of products high in fat, saturated fat, cholesterol or sodium.

---

[1] Alternatively, when used as part of a nutrient content claim, the term "antioxidant" or "antioxidants" (such as "high in antioxidants") may be linked by a symbol (such as an asterisk) that refers to the same symbol that appears elsewhere on the same panel of a product label followed by the name or names of the nutrients with the recognized antioxidant activity. If this is done, the list of nutrients must appear in letters of a type size height no smaller than the larger of one half of the type size of the largest nutrient content claim or 1/16 inch.

54.     Defendant's antioxidant claims on the packages Misbranded Food Products violate California law:  (1) because the names of the antioxidants are not disclosed on the product labels; (2) because there are no RDIs for the antioxidants being touted, including flavonoids; (3) because the claimed antioxidant nutrients fail to meet the requirements for nutrient content claims in 21 C.F.R. § 101.54(b), (c), or (e) for "High" claims, "Good Source" claims, and "More" claims, respectively; (4) because Hershey lacks adequate scientific evidence that the claimed antioxidant nutrients participate in physiological, biochemical, or cellular processes that inactivate free radicals or prevent free radical-initiated chemical reactions after they are eaten and absorbed from the gastrointestinal tract, and (5) Hershey's chocolate and cocoa powder products, including "Special Dark" brands, undergo the process of dutching/alkalization thereby reducing or eliminating any alleged antioxidants.

For example, Hershey's Special Dark Chocolate Bars and Special Dark Kisses bear the statement "Natural Source of Flavanol Antioxidants," and its web page compares the antioxidant "power" of dark chocolate to other foods and states:  "Data from a study conducted by The Hershey Company and previous studies from USDA and others indicate that, gram for gram; cocoa powder and chocolate are among the most concentrated sources of flavanol antioxidants.  The antioxidant power of about 4 tasting squares (40 g/1.4 oz) of Hershey's Extra Dark chocolate is **more than** that of 4 cups of green tea, 1½ glasses of red wine or ¾ cup blueberries." www.hersheys.com/nutrition-professionals/chocolate/Chocolate_FAQ.aspx (emphasis added).

55.     For these reasons, Hershey's antioxidant claims at issue in this Complaint are misleading and in violation of 21 C.F.R. § 101.54 and California law, and the products at issue are misbranded as a matter of law. Misbranded products cannot be legally manufactured, advertised, distributed, held or sold and are legally worthless.

56.     In addition to its guidance to industry, the FDA has sent warning letters to industry, including many of Defendant's peer food manufacturers for the same types of unlawful nutrient content claims described above.

57.     Similarly, on August 23, 2010, the FDA sent a warning letter to Unilever, informing Unilever of its failure to comply with the requirements of the FDCA and its

regulations, all of which have been expressly adopted by California in its Sherman Law. The FDA

Warning Letter to Unilever stated, in pertinent part:

**Unauthorized Nutrient Content Claims**

Under section 403(r)(1)(A) of the Act [21 U.S.C. 343(r)(1)(A)], a claim that characterizes the level of a nutrient which is of the type required to be in the labeling of the food must be made in accordance with a regulation promulgated by the Secretary (and, by delegation, FDA) authorizing the use of such a claim. The use of a term, not defined by regulation, in food labeling to characterize the level of a nutrient misbrands a product under section 403(r)(1)(A) of the Act.

Nutrient content claims using the term "antioxidant" must also comply with the requirements listed in 21 CFR 101.54(g). These requirements state, in part, that for a product to bear such a claim, an RDI must have been established for each of the nutrients that are the subject of the claim (21 CFR 101.54(g)(1)), and these nutrients must have recognized antioxidant activity (21 CFR 101.54(g)(2). The level of each nutrient that is the subject of the claim must also be sufficient to qualify for the claim under 21 CFR 101.54(b), (c), or (e) (21 CFR 101.54(g)(3)). For example, to bear the claim "high in antioxidant vitamin C," the product must contain 20 percent or more of the RDI for vitamin C under 21 CFR 101.54(b). Such a claim must also include the names of the nutrients that are the subject of the claim as part of the claim or, alternatively, the term "antioxidant" or "antioxidants" may be linked by a symbol (e.g., an asterisk) that refers to the same symbol that appears elsewhere on the same panel of the product label, followed by the name or names of the nutrients with recognized antioxidant activity (21 CFR 101.54(g)(4)). The use of a nutrient content claim that uses the term "antioxidant" but does not comply with the requirements of 21 CFR 101.54(g) misbrands a product under section 403(r)(2)(A)(i) of the Act.

Your webpage entitled "Tea and Health" and subtitled "Tea Antioxidants" includes the statement, "LIPTON Tea is made from tea leaves rich in naturally protective antioxidants." The term "rich in" is defined in 21 CFR 101.54(b) and may be used to characterize the level of antioxidant nutrients (21 CFR 101.54(g)(3)). However, this claim does not comply with 21 CFR 101.54(g)(4) because it does not include the nutrients that are the subject of the claim or use a symbol to link the term "antioxidant" to those nutrients. Thus, this claim misbrands your product under section 403(r)(2)(A)(i) of the Act.

This webpage also states that "tea is a naturally rich source of antioxidants." The term "rich source" characterizes the level of antioxidant nutrients in the product and, therefore, this claim is a nutrient content claim (see section 403(r)(1) of the Act and 21 CFR 101.13(b)). Even if we determined that the term "rich source" could be considered a synonym for a term defined by regulation (e.g., "high" or "good source"), nutrient content claims that use the term "antioxidant" must meet the requirements of 21 CFR 101.54(g). The claim "tea is a naturally rich source of antioxidants" does not include the nutrients that are the subject of the claim or use a

1   symbol to link the term "antioxidant" to those nutrients, as required by 21 CFR
    101.54(g)(4). Thus, this claim misbrands your product under section 403(r)(2)(A)(i)
2   of the Act.

3   The product label back panel includes the statement "packed with protective
    FLAVONOID ANTIOXIDANTS." The term "packed with" characterizes the level
4   of flavonoid antioxidants in the product; therefore, this claim is a nutrient content
    claim (see section 403(r)(1) of the Act and 21 CFR 101.13(b)). Even if we
5   determined that the term "packed with" could be considered a synonym for a term
6   defined by regulation, nutrient content claims that use the term "antioxidant" must
    meet the requirements of 21 CFR 101.54(g). The claim "packed with
7   FLAVONOID ANTIOXIDANTS" does not comply with 21 CFR 101.54(g)1
    because no RDI has been established for flavonoids. Thus, this unauthorized
8   nutrient content claim causes your product to be misbranded under section
9   403(r)(2)(A)(i) of the Act.

10  The above violations are not meant to be an all-inclusive list of deficiencies in your
    products or their labeling. It is your responsibility to ensure that all of your products
11  are in compliance with the laws and regulations enforced by FDA. You should take
    prompt action to correct the violations. Failure to promptly correct these violations
12  may result in regulatory actions without further notice, such as seizure and/or
13  injunction.

14  We note that your label contains a chart entitled "Flavonoid Content of selected
    beverages and foods." The chart appears to compare the amounts of antioxidants in
15  your product with the amount of antioxidants in orange juice, broccoli, cranberry
    juice and coffee. However, the information provided may be misinterpreted by the
16  consumer because although the chart is labeled, in part, "Flavonoid Content," the y-
17  axis is labeled "AOX"; therefore, the consumer might believe that the chart is
    stating the total amount of antioxidants rather than specifically measuring the
18  amount of flavonoids in the product.

19  http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/ucm224509.htm

20      58.     In addition to the violations set forth above, 21 C.F.R. § 101.14, which has been

21  adopted as California law, prohibits unapproved antioxidant related health claims and also makes

22  it unlawful to place antioxidant health claims on products that are high in fat, saturated fat,

23  cholesterol or sodium.  Hershey has violated 21 C.F.R. § 101.14 with respect to a number of

24  chocolate products including, specifically, the Misbranded Food Products.

25

26

27

28

59.     Similarly, Hershey violated 21 C.F.R. § 101.13(h) which makes it unlawful to place antioxidant nutrient claims on products that are high in fat, saturated fat, cholesterol or sodium, without mandated disclosures of the high fat, saturated fat, cholesterol or sodium content.

60.     The types of misrepresentations made above would be considered by a reasonable consumer when deciding to purchase the products. Not only do Hershey's antioxidant, nutrient content and health claims regarding the benefits of "flavonoids" violate FDA rules and regulations, they directly contradict current scientific research, which has concluded: "[T]he evidence today does not support a direct relationship between tea consumption and a physiological AOX [antioxidant] benefit." This conclusion was reported by Dr. Jane Rycroft, Director of Lipton Tea Institute of Tea, in an article published in January, 2011, in which Dr. Rycroft states:

> Only a few scientific publications report an effect of tea on free radical damage in humans using validated biomarkers in well designed human studies. Unfortunately, the results of these studies are at variance and the majority of the studies do not report significant effects . . .
>
> Therefore, despite more than 50 studies convincingly showing that flavonoids possess potent antioxidant activity *in vitro,* the ability of flavonoids to act as an antioxidant *in vivo* [in humans], has not been demonstrated.
>
> Based on the current scientific consensus that the evidence today does not support a direct relationship between tea consumption and a physiological AOX benefit...
>
> No evidence has been provided to establish that having antioxidant activity/content and/or antioxidant properties is a beneficial physiological effect.

Rycroft, Jane, "The Antioxidant Hypothesis Needs to be Updated", Vol. 1, *Tea Quarterly Tea Science Overview,* Lipton Tea Institute of Tea Research (Jan. 2011), pp. 2-3.

61.     The failure to comply with the labeling requirements of 21 C.F.R. § 101.54 renders the Misbranded Food Products misbranded as a matter of federal and California law. Misbranded products cannot be legally sold and are legally worthless.

### 3.     Defendant Makes Other Unlawful Nutrient Content Claims

62.     In addition, Hershey has repeatedly made unlawful nutrient content claims on products containing disqualifying levels of fat, saturated fat, cholesterol and sodium, because it has failed to include disclosure statements required by law that are designed to inform consumers

of the inherently unhealthy nature of those products in violation of 21 C.F.R. § 101.13(h), which has been incorporated in California's Sherman Law.

63. 21 C.F.R. § 101.13(h)(1) provides that: "If a food … contains more than 13.0 g of fat, 4.0 g of saturated fat, 60 milligrams (mg) of cholesterol, or 480 mg of sodium per reference amount customarily consumed, per labeled serving, or, for a food with a reference amount customarily consumed of 30 g or less … per 50 g … **then that food must bear a statement disclosing that the nutrient exceeding the specified level is present in the food….**"

64. Hershey Special Dark Chocolate Bars, Special Dark Kisses and Special Dark Cocoa make such claims despite disqualifying levels of unhealthy components without proper disclosure.

65. The failure to include the required disclosure statement renders the products at issue misbranded as a matter of law. Misbranded products cannot be legally held or sold and are legally worthless.

66. For example, Defendant's Special Dark Chocolate Cocoa has disqualifying levels of sodium per 50 grams amount and the Special Dark Kisses have 40% **saturated** fat per serving which is a disqualifying amount. These levels of sodium and saturated fat bar the making of a nutrient content claim without a saturated fat disclosure statement.

67. Based on the fat, saturated fat, cholesterol and sodium content of these products, pursuant to federal and California law, Hershey must include a warning statement adjacent to the antioxidant nutrient claim that informs consumers of the high levels of fat, saturated fat, cholesterol or sodium. No such saturated fat disclosure statement currently exists on these products. Therefore, they are misbranded as a matter of federal and California law and cannot be sold because they are legally worthless.

### 4. Defendant Makes Unlawful Health Claims

68. 21 C.F.R. § 101.14, which has been expressly adopted by California, prohibits manufacturers from making any health claim about products that have disqualifying levels of fat, saturated fat, cholesterol or sodium. The disqualifying levels are the same as those utilized in 21 C.F.R. § 101.13.

69.     In addition, 21 C.F.R. § 101.65, which has been adopted by California, sets certain minimum nutritional requirements for making an implied nutrient content claim that a product is healthy. For example, for unspecified foods the food must be low in fat, saturated fat, sodium and cholesterol and supply at least 10 percent of the RDI of one or more specified nutrients.

70.     Hershey has misrepresented the healthiness of its products while failing to meet the regulatory thresholds for making such claims either because: (1) the products contain disqualifying amounts of fat, saturated fat, cholesterol or sodium that preclude the inclusion of any health claim on their label; or (2) the products lack minimum nutritional requirements to make such a claim.

71.     Hershey food products violate 21 C.F.R. § 101.14 or 21 C.F.R. § 101.65, including the Misbranded Food Products.

72.     For example, the labels of Hershey Special Dark Chocolate Bars and Special Dark Kisses state that these products contain 7 and 8 grams of saturated fat per 36 and 41 gram serving sizes respectively which are disqualifying amounts of saturated fat. Similarly, these products fail to meet the minimal nutritional content requirements to make such health related claims as they are devoid of any of the required nutrients mandated by 21 C.F.R. § 101.65.

73.     Likewise, Hershey's Special Dark Cocoa contains 65 milligrams of sodium per serving which is a disqualifying amount of sodium under 21 C.F. R. § 101.65.

74.     The FDA has sent other chocolate companies warning letters for similar violations.

75.     On May 31, 2006, the FDA sent a warning letter to another company, Masterfoods USA, informing company of its failure to comply with the requirements of the FDCA and its regulations, all of which have been expressly adopted by California in its Sherman Law. The FDA Warning Letter to Masterfoods stated, in pertinent part:

> The Food and Drug Administration (FDA) has reviewed the labels for several candy bar products in your Cocoa Via&#8482; product line. FDA's review found serious violations of the Federal Food, Drug, and Cosmetic Act (the Act) and regulations. You can find the Act and regulations at www.fda.gov.

> [ . . . ]

In addition, your Cocoa Via&#8482; Original Chocolate Bars and Blueberry & Almond Chocolate Bars are misbranded under section 403(a)(1) of the Act [21 U.S.C. 343(a)(1)] because their labels bear false or misleading claims that the products promote heart health. For example, the labels of these products bear the claims "Promotes a Healthy Heart" and "Now you can have real chocolate pleasure with real heart health benefits." These claims are false or misleading because of the high levels of saturated fat in the products.

The Original Chocolate Bars contain 3.5 grams of saturated fat per labeled serving (one bar weighing 22 grams), or approximately 6.4 grams per reference amount customarily consumed (40 grams) .1 The Blueberry & Almond Chocolate Bars contain 3 grams of saturated fat per labeled serving (one bar weighing 22 grams), or approximately 5.5 grams per reference amount (40 grams). Thus, each of these products contains more than 20% of the Daily Value (DV) for saturated fat (20 grams) per reference amount. A food that contains 20% or more of the DV of a nutrient per reference amount is high in that nutrient (see 21 CFR 101 .54(b)(1), defining "high"). Further, the labels of the Original Chocolate Bars and Blueberry & Almond Chocolate Bars recommend consuming two servings a day (i.e., two bars). Following this recommendation would result in consuming approximately one-third of the DV for saturated fat from these candy bars alone.

The relationship between saturated fat intake and risk of coronary heart disease is well established (DHHS and USDA, Dietary Guidelines for Americans, 2005, 6th Edition, Washington, D.C., U.S. Government Printing Office, January 2005). Because of their high levels of saturated fat, your Original Chocolate Bars and Blueberry & Almond Chocolate Bars do not promote a healthy heart when consumed daily as recommended on the product label, even though the products also contain ingredients, such as plant sterol esters, that have been shown to lower LDL cholesterol when consumed as part of a low fat, low cholesterol diet. As a matter of fact, the regulation authorizing a health claim for plant stero/stanol esters and reduced risk of heart disease includes the requirement that the food bearing the claim be low in saturated fat (1 g or less of saturated fat per reference amount and not more than 15% of calories from saturated fatty acids) [21 CFR 101.83(c)(2)(iii)(B)].

http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2006/ucm075927.htm#.T

0cCN6wTmHw.email

76.     On September 15, 2011, the FDA sent a Warning Letter to TCHO, informing TCHO of its failure to comply with the requirements of the FDCA and its regulations, all of which have been expressly adopted by California in its Sherman Law.

77.     The warning letter stated in pertinent part:

The Food and Drug Administration (FDA) reviewed your website at the internet address www.tcho.com in September 2011. FDA's review of your website found serious violations of the Federal Food, Drug, and Cosmetic Act (the Act), as discussed in detail below.

[ . . .]

**Unapproved New Drugs**

Based on our review of your website, we have determined that your chocolate products, including your TCHO-A-DAY product line, are promoted for conditions that cause them to be drugs within the meaning of section 201(g)(1)(B) of the Act [21 U.S.C. § 321(g)(1)(B)]. The therapeutic claims on your website establish that your chocolate products are drugs because they are intended for use in the cure, mitigation, treatment, or prevention of disease. The marketing of these products with these claims violates the Act.

Examples of claims on your website include the following:

From your homepage under the heading "Chocolates" and the sub-heading "Healthy Chocolate":

      TCHO-A-DAY 30, 60, and 90
- "A growing body of scientific research has shown dark chocolate has a wide range of health benefits relating to: . . . diabetes, anti-inflammatory effects . . . tooth decay."

Your website makes further claims with respect to dark chocolate and chocolate in general, including but not limited to the following:

From your homepage under the heading "Blog" and the sub-heading "The Mind of TCHO":
- "[C]hocolate lowers blood pressure."
- "[D]ark chocolate . . . helps decrease blood pressure"
- "Dark Chocolate May Help Reduce Dangers For Cirrhosis Patients"
- "[E]ating certain kinds of chocolate may actually prolong the lives of people with cirrhosis and other forms of advanced liver disease."
- "Dark Chocolate . . . can help alleviate . . . depression . . . ."
- "Heart-attack survivors who ate chocolate just twice a week . . . cut their risk of dying from heart disease threefold."

From your homepage under the heading "Blog" and the sub-heading "Chocolate and Health":
- "[D]ark Chocolate May Guard Against Brain Injury From Stroke"
- "Chocolate . . . lower[s] blood pressure, study finds."
- "Cocoa can decrease blood pressure"
- "Chocolate protects against cardiac mortality following myocardial infarction"

Furthermore, your TCHO 30 label on the website bears a "Good Drug Facts" panel which lists the following active ingredients: Theobromine, Trytophan [sic], Flavanols, Phenethylamine [sic], and Love.

In addition, your website references and links to numerous scientific studies on the relation of chocolate and cognition, antioxidant activity, behavior, bioavailability, blood pressure, cardiovascular health, anti-inflammation, diabetes, immune health, and dermatology.

**When scientific publications are used commercially by the seller of a product to promote the product to consumers, such publications may become evidence of the product's intended use.** The following are examples of reference citations used to market your product for disease treatment and prevention on your website and are thus evidence of your products' intended use as drugs:

From your homepage under the heading "Chocolates" and the sub-heading "Healthy Chocolate":
- "Sustained benefits in vascular function through flavanol-containing cocoa in medicated diabetic patients: a double-masked, randomized, controlled trial. Journal of American College of Cardiology. June 2008; 51(22): 2141-2149. Balzer, J., Rassaf, T., Heiss, C., Kleinbongard, P."
- "Effects of cocoa flavanols on risk factors for cardiovascular disease. Asia Pacific Journal of Clinical Nutrition. 2008. 17 Suppl 1: 284-287.
- Erdman, J., Carson, L., Kwik-Uribe, C., Evans, E., Allen, R."

The claims listed above establish that your products are drugs under section 201(g)(1)(B) of the Act [21 U.S.C. § 321(g)(1)(B)], because they are intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease. Your products are not generally recognized as safe and effective for the above referenced uses and, therefore, the products are "new drugs" as defined by section 201(p) of the Act [21 U.S.C. § 321(p)]. A new drug may not be legally marketed in the United States without prior approval from FDA as described in section 505(a) of the Act [21 U.S.C. § 355(a)]. FDA approves a new drug on the basis of scientific data submitted to a drug sponsor to demonstrate that the drug is safe and effective.

**Misbranded Drugs**

Because your chocolate products are being offered for conditions that are not amenable to self-diagnosis and treatment by individuals who are not medical practitioners, adequate directions cannot be written so that a layman can use these products safely for their intended uses. Thus, your product labeling fails to bear adequate directions for the products' intended uses, causing the products to be misbranded under section 502(f)(1) of the Act [21 U.S.C. § 352(f)(1)]. The introduction of a misbranded drug into interstate commerce is a violation of section 301(a) of the Act, [21 U.S.C. § 331(a)].

**Misbranded Food**

Your chocolate products are further misbranded within the meaning of section 403(r)(1)(B) of the Act [21 U.S.C. § 343(r)(1)(B)] because their labeling bears health claims that have not been authorized by regulation or the Act.  Your website, www.tcho.com, bears the following unauthorized health claims:

From your homepage under the heading "Blog" and the sub-heading "The Mind of TCHO":
- "Chocolate's protective natural substances . . . help prevent cholesterol from sticking to your artery walls, reducing your risk of heart attack and stroke."

From your homepage under the heading "Blog" and the sub-heading "Chocolate and Health":
- "Chocolate reduces the risk of stroke or heart attack by increasing flow of blood around the brain . . . ."

This health claim misbrands your product because it has not been authorized either by regulation [see section 343(r)(3)(A)-(B) of the Act [21 U.S.C. § 343(r)(3)(A)(B)]] or under authority of the health claim notification provision of the Act [see section 343(r)(3)(C) of the Act [21 U.S.C. § 343(r)(3)(G)]].

http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2011/ucm277253.htm (emphasis added).

78.     The failure to comply with the labeling requirements of 21 C.F.R. § 101.14 or 21 C.F.R. § 101.65 renders Hershey's products misbranded as a matter of federal and California law. Misbranded products cannot be legally sold and are legally worthless.

**D.     Defendant Has Violated California Law**

79.     Defendant has manufactured, advertised, distributed and sold products that are misbranded under California law. Misbranded products cannot be legally manufactured, advertised, distributed or sold and are legally worthless as a matter of law.

80.     Defendant has violated California Health & Safety Code §§ 109885 and 110390 which make it unlawful to disseminate false or misleading food advertisements that include statements on products and product packaging or labeling or any other medium used to directly or indirectly induce the purchase of a food product.

81.     Defendant has violated California Health & Safety Code § 110395 which makes it unlawful to manufacture, sell, deliver, hold or offer to sell any misbranded food.

82.     Defendant has violated California Health & Safety Code § 110398 which makes it unlawful to deliver or proffer for delivery any food that has been falsely advertised.

83.     Defendant has violated California Health & Safety Code § 110660 because their labeling is false and misleading in one or more ways, as follows:

a.      They are misbranded under California Health & Safety Code § 110665 because their labeling fails to conform to the requirements for nutrient labeling set forth in 21 U.S.C. § 343(q) and the regulations adopted thereto;

b.      They are misbranded under California Health & Safety Code § 110670 because their labeling fails to conform with the requirements for nutrient content and health claims set forth in 21 U.S.C. § 343(r) and the regulations adopted thereto; and

c.      They are misbranded under California Health & Safety Code § 110705 because words, statements and other information required by the Sherman Law to appear on their labeling either are missing or not sufficiently conspicuous.

84.     Defendant has violated California Health & Safety Code § 110760 which makes it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded.

85.     Defendant has violated California Health & Safety Code § 110765 which makes it unlawful for any person to misbrand any food.

86.     Defendant has violated California Health & Safety Code § 110770 which makes it unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for deliver any such food.

87.     Defendant has violated the standard set by 21 C.F.R. § 101.2, which has been incorporated by reference in the Sherman Law, by failing to include on their product labels the nutritional information required by law.

88.     Defendant has violated the standards set by 21 CFR §§ 101.13, and 101.54, which have been adopted by reference in the Sherman Law, by including unauthorized antioxidant claims and nutrient content claims on their products.

89. Defendant has violated the standards set by 21 CFR §§ 101.14, and 101.65, which have been adopted by reference in the Sherman Law, by including unauthorized health and healthy claims on their products.

90. By selling products that are high in sodium, cholesterol, fat, and saturated fat, while failing to properly disclose that fact, Defendant has violated and continues to violate federal laws and regulations prohibiting the misbranding of food products including those in 21 U.S.C. § 343, which have been adopted by reference in the Sherman Law.

91. Defendant has violated 201(g)(1)(B) of the Act [21 U.S.C. § 321(g)(1)(B) by misbranding its chocolates as being intended for the diagnosis, cure, mitigation, treatment, or prevention of disease thereby establishing that the products are unapproved "new drugs" as defined by 21 U.S.C. § 321(p) which were not given prior approval by the FDA as described in 21 U.S.C. § 355 (a).

**E.** **Plaintiff Purchased Defendant's Misbranded Food Products**

92. Plaintiff cares about the nutritional content of his food and seeks to maintain a healthy diet.

93. Plaintiff purchased Hershey's Misbranded Food Products at issue in this Complaint, including Hershey's dark chocolate and cocoa products, on occasions during the Class Period.

94. Plaintiff purchased the following products:

Special Dark Chocolate Bar





Special Dark Kisses



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15



Special Dark Cocoa

16

17

18

19

20

21

22

23

24

25

26

27

28



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





Natural Unsweetened Cocoa



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



19    95.    As a result of Hershey's misrepresentations, Plaintiff and thousands of others in

20  California purchased the products at issue.

21    95.    Plaintiff read the labels on Defendant's Misbranded Food Products, including the

22  antioxidant, nutrient content and health claims, before purchasing them.

23    96.    Plaintiff relied on Defendant's package labeling including the antioxidant, nutrient

24  content and health claims, and based and justified the decision to purchase Defendant's products

25  in substantial part on Defendant's package labeling including the antioxidant, nutrient content and

26  health claims.

27

28

97.    At point of sale, Plaintiff did not know, and had no reason to know, that Defendant's products were misbranded as set forth herein, and would not have bought the products had he known the truth about them.

98.    At point of sale, Plaintiff did not know, and had no reason to know, that Defendant's labeling claims including the antioxidant, health and nutrient content  claims were unlawful and unauthorized as set forth herein, and would not have bought the products had he known the truth about them.

99.    As a result of Defendant's unlawful labeling claims, Plaintiff and thousands of others in California and throughout the United States purchased the Misbranded Food Products at issue.

100.    Defendant's labeling, advertising and marketing as alleged herein are false and misleading and were designed to increase sales of the products at issue.    Defendant's misrepresentations are part of an extensive labeling, advertising and marketing campaign, and a reasonable person would attach importance to Defendant's misrepresentations in determining whether to purchase the products at issue.

101.    A reasonable person would also attach importance to whether Defendant's products were legally salable, and capable of legal possession, and to Defendant's representations about these issues in determining whether to purchase the products at issue. Plaintiff would not have purchased Defendant's Misbranded Food Products had he known they were not capable of being legally sold or held.

## CLASS ACTION ALLEGATIONS

102.    Plaintiff brings this action as a class action pursuant to Federal Rule of Procedure 23(b)(2) and 23(b)(3) on behalf of the following class:

> All persons in California who purchased Hershey (1) Special Dark Chocolate Bars, (2) Special Dark Kisses, (3) Special Dark Cocoa or (4) Cocoa within the last four years (the "Class").

103.    The following persons are expressly excluded from the Class:  (1) Defendant and its subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed Class; (3) governmental entities; and (4) the Court assigned to this case and its staff.

104. This action can be maintained as a class action because there is a well-defined community of interest in the litigation and the proposed Class are easily ascertainable.

105. <u>Numerosity</u>: Based upon Hershey's publicly available sales data with respect to the misbranded products at issue, it is estimated that the Class number in the thousands, and that joinder of all Class members is impracticable.

106. <u>Common Questions Predominate</u>: This action involves common questions of law and fact applicable to each Class member that predominate over questions that affect only individual Class members. Thus, proof of a common set of facts will establish the right of each Class member to recover. Questions of law and fact common to each Class member include, just for example:

    a. Whether Defendant engaged in unlawful, unfair or deceptive business practices by failing to properly package and label their Misbranded Food Products sold to consumers;

    b. Whether the food products at issue were misbranded as a matter of law;

    c. Whether Defendant made unlawful and misleading nutrient content claims with respect to their food products sold to consumers;

    d. Whether Defendant violated California Bus. & Prof. Code § 17200, *et seq.*, California Bus. & Prof. Code § 17500 *et seq.*, the Consumers Legal Remedies Act, Cal. Civ. Code §1750, *et seq.*, and the Sherman Law;

    e. Whether Plaintiff and the Class are entitled to equitable and/or injunctive relief;

    f. Whether Defendant's unlawful, unfair and/or deceptive practices harmed Plaintiff and the Class; and

    g. Whether Defendant was unjustly enriched by their deceptive practices.

107. <u>Typicality</u>: Plaintiff's claims are typical of the claims of the Class because they bought Defendant's Misbranded Food Products during the Class Period. Defendant's unlawful, unfair and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were received. Plaintiff and the Class sustained similar injuries arising out of Defendant's conduct in violation of California law. The injuries of each member of the Class were caused directly by Defendant's wrongful conduct. In addition, the factual underpinning of Defendant's misconduct is common to all Class members and represents a

common thread of misconduct resulting in injury to all members of the Class. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the Class members and are based on the same legal theories.

108. Adequacy: Plaintiff will fairly and adequately protect the interests of the Class. Neither Plaintiff nor counsel have any interests that conflict with or are antagonistic to the interests of the Class members. Plaintiff has retained highly competent and experienced class action attorneys to represent their interests and those of the members of the Class. Plaintiff and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and their counsel are aware of their fiduciary responsibilities to the Class members and will diligently discharge those duties by vigorously seeking the maximum possible recovery for the Class.

109. Superiority: There is no plain, speedy or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Further, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Class treatment of common questions of law and fact would also be superior to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the Court and the litigants, and will promote consistency and efficiency of adjudication.

110. The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendant have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief

with respect to the Class as a whole.

111.  Plaintiff and his counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Business and Professions Code § 17200, *et seq.*
### <u>Unlawful Business Acts and Practices</u>

112.  Plaintiff incorporates by reference each allegation set forth above.

113.  Defendant's conduct constitutes unlawful business acts and practices.

114.  Defendant sold Misbranded Food Products in California during the Class period.

115.  Defendants are corporations and, therefore, each is a "person" within the meaning of the Sherman Law.

116.  Defendant's business practices are unlawful under § 17200, *et seq.* by virtue of Defendant's violations of Article 6 (misbranded food) of the Sherman Law.

117.  Defendant's business practices are unlawful under § 17200, *et seq.* by virtue of Defendant's violations of § 17500, *et seq.*, which forbids untrue and misleading advertising.

118.  Defendant sold Plaintiff and the Class Misbranded Food Products that were not capable of being sold legally and which were legally worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

119.  As a result of Defendant's illegal business practices, Plaintiff and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and to restore to any Class Member any money paid for the Misbranded Food Products.

120.  Defendant's unlawful business acts present a threat and reasonable continued likelihood of deception to Plaintiff and the Class.

121.  As a result of Defendant's conduct, Plaintiff and the Class, pursuant to Business

and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendants, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Hershey Misbranded Food Products by Plaintiff and the Class.

**SECOND CAUSE OF ACTION**
**Business and Professions Code § 17200, *et seq.***
<u>**Unfair Business Acts and Practices**</u>

122. Plaintiff incorporates by reference each allegation set forth above.

123. Defendant's conduct as set forth herein constitutes unfair business acts and practices.

124. Defendant sold Misbranded Food Products in California during the class period.

125. Plaintiff and members of the Class suffered a substantial injury by virtue of buying Defendant's Misbranded Food Products that they would not have purchased absent Defendant's illegal conduct as set forth herein.

126. Defendant's deceptive marketing, advertising, packaging and labeling of their Misbranded Food Products was of no benefit to consumers, and the harm to consumers and competition is substantial.

127. Defendant sold Plaintiff and the Class Misbranded Food Products that were not capable of being legally sold and that were legally worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

128. Plaintiff and the Class who purchased Defendant's Misbranded Food Products had no way of reasonably knowing that the products were not properly marketed, advertised, packaged and labeled, and thus could not have reasonably avoided the injury each of them suffered.

129. The consequences of Defendant's conduct as set forth herein outweighs any justification, motive or reason therefore. Defendant's conduct is and continues to be immoral, unethical, unscrupulous, contrary to public policy, and is substantially injurious to Plaintiff and the Class.

- 38 -
*Class Action Complaint*

130. As a result of Defendant's conduct, Plaintiff and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendants, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Hershey Misbranded Food Products by Plaintiff and the Class.

## THIRD CAUSE OF ACTION
### Business and Professions Code § 17200, *et seq.*
### Fraudulent Business Acts and Practices

131. Plaintiff incorporates by reference each allegation set forth above.

132. Defendant's conduct as set forth herein constitutes fraudulent business practices under California Business and Professions Code sections § 17200, *et seq.*

133. Defendant sold Misbranded Food Products in California during the Class Period.

134. Defendant's misleading marketing, advertising, packaging and labeling of the Misbranded Food Products was likely to deceive reasonable consumers, and in fact, Plaintiff and members of the Class were deceived. Defendant has engaged in fraudulent business acts and practices.

135. Defendant's fraud and deception caused Plaintiff and the Class to purchase Hershey Misbranded Food Products that they would otherwise not have purchased had they known the true nature of those products.

136. Defendant sold Plaintiff and the Class Misbranded Food Products that were not capable of being sold legally or held and that were legally worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

137. As a result of Defendant's conduct as set forth herein, Plaintiff and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendants, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Hershey Misbranded Food Products by Plaintiff and the Class.

**FOURTH CAUSE OF ACTION**
**Business and Professions Code § 17500, *et seq.***
**Misleading and Deceptive Advertising**

138. Plaintiff incorporates by reference each allegation set forth above.

139. Plaintiff assert this cause of action for violations of California Business and Professions Code § 17500, *et seq.* for misleading and deceptive advertising against Defendants.

140. Defendant sold Misbranded Food Products in California during the Class period.

141. Defendants engaged in a scheme of offering the Misbranded Food Products for sale to Plaintiff and members of the Class by way of, *inter alia*, product packaging and labeling, and other promotional materials. These materials misrepresented and/or omitted the true contents and nature of the Hershey Misbranded Food Products. Defendant's advertisements and inducements were made within California and come within the definition of advertising as contained in Business and Professions Code §17500, *et seq.* in that such product packaging and labeling, and promotional materials were intended as inducements to purchase the Hershey Misbranded Food Products and are statements disseminated by Defendant to Plaintiff and the Class that were intended to reach members of the Class. Defendant knew, or in the exercise of reasonable care should have known, that these statements were misleading and deceptive as set forth herein.

142. In furtherance of their plan and scheme, Defendant prepared and distributed within California product packaging and labeling, and other promotional materials, statements that misleadingly and deceptively represented the ingredients contained in and the nature of Defendant's Misbranded Food Products. Plaintiff and the Class necessarily and reasonably relied on Defendant's materials, and were the intended targets of such representations.

143. Defendant's conduct in disseminating misleading and deceptive statements in California to Plaintiff and the Class was and is likely to deceive reasonable consumers by obfuscating the true ingredients and nature of the Defendant's Misbranded Food Products in violation of the "misleading prong" of California Business and Professions Code § 17500, *et seq.*

144. As a result of Defendant's violations of the "misleading prong" of California Business and Professions Code § 17500, *et seq.*, Defendant has been unjustly enriched at the

expense of Plaintiff and the Class.  Misbranded products cannot be legally sold and are legally worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

145.  Plaintiff and the Class, pursuant to Business and Professions Code § 17535, are entitled to an order enjoining such future conduct by Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Defendant'' Misbranded Food Products by Plaintiff and the Class.

**FIFTH CAUSE OF ACTION**
**Business and Professions Code § 17500,** *et seq.*
**<u>Untrue Advertising</u>**

146.  Plaintiff incorporates by reference each allegation set forth above.

147.  Plaintiff assert this cause of action against Defendants for violations of California Business and Professions Code § 17500, *et seq.*, regarding untrue advertising.

148.  Defendant sold mislabeled and Misbranded Food Products in California during the Class period.

149.  Defendant engaged in a scheme of offering the Misbranded Food Products for sale to Plaintiff and the Class by way of product packaging and labeling, and other promotional materials.  These materials misrepresented and/or omitted the true contents and nature of the Defendant's Misbranded Food Products.  Defendant's advertisements and inducements were made in California and come within the definition of advertising as contained in Business and Professions Code §17500, *et seq.* in that the product packaging and labeling, and promotional materials were intended as inducements to purchase the Hershey Misbranded Food Products, and are statements disseminated by Defendants to Plaintiff and the Class.  Defendants knew, or in the exercise of reasonable care should have known, that these statements were untrue.

150.  In furtherance of their plan and scheme, Defendants prepared and distributed in California and nationwide via product packaging and labeling, and other promotional materials, statements that falsely advertise the ingredients contained in the Hershey Misbranded Food Products, and falsely misrepresented the nature of those products. Plaintiff and the Class were the intended targets of such representations and would reasonably be deceived by Defendant's

1    materials.

2        151. Defendant's conduct in disseminating untrue advertising throughout California and

3    nationwide deceived Plaintiff and members of the Class by obfuscating the contents, nature and

4    quality of the Hershey Misbranded Food Products in violation of the "untrue prong" of California

5    Business and Professions Code § 17500.

6        152. As a result of Defendant's violations of the "misleading prong" of California

7    Business and Professions Code § 17500, *et seq.*, Defendant has been unjustly enriched at the

8    expense of Plaintiff and the Class.

9        153. Misbranded products cannot be legally sold and are legally worthless. Plaintiff and

10   the Class paid a premium price for the Misbranded Food Products.

11       154. Plaintiff and the Class, pursuant to Business and Professions Code § 17535, are

12   entitled to an order enjoining such future conduct by Defendants, and such other orders and

13   judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any

14   money paid for Defendant's Misbranded Food Products by Plaintiff and the Class.

15                          **SIXTH CAUSE OF ACTION**
16          **Consumers Legal Remedies Act, Cal. Civ. Code §1750, *et seq.***

17       155. Plaintiff incorporates by reference each allegation set forth above.

18       156. This sixth cause of action is brought pursuant to the CLRA. This cause of action

19   does not currently seek monetary damages and is limited solely to injunctive relief. Plaintiff

20   intend to amend their Complaint to seek damages in accordance with the CLRA after providing

21   Defendants with notice pursuant to Cal. Civ. Code § 1782.

22       157. At the time of any amendment seeking damages under the CLRA, Plaintiff will

23   demonstrate that the violations of the CLRA by Defendant was willful, oppressive and fraudulent,

24   thus supporting an award of punitive damages.

25       158. Consequently, Plaintiff and the Class will be entitled to actual and punitive

26   damages against Defendants for their violations of the CLRA. In addition, pursuant to Cal. Civ.

27   Code § 1782(a)(2), Plaintiff and the Class will be entitled to an order enjoining the above-

28   described acts and practices, providing restitution to Plaintiff and the Class, ordering payment of

costs and attorneys' fees, and any other relief deemed appropriate and proper by the Court pursuant to Cal. Civ. Code § 1780.

159. Defendant's actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale of goods or services to consumers.

160. Defendant sold mislabeled and Misbranded Food Products in California during the Class period.

161. Plaintiff and members of the Class are "consumers" as that term is defined by the CLRA in Cal. Civ. Code §1761(d).

162. The Defendant's Misbranded Food Products were and are "goods" within the meaning of Cal. Civ. Code §1761(a).

163. By engaging in the conduct set forth herein, Defendant violated and continue to violate Sections 1770(a)(5), (7) (9), and (16) of the CLRA, because Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices in that they misrepresent the particular ingredients, characteristics, uses, benefits and quantities of the goods.

164. By engaging in the conduct set forth herein, Defendant violated and continues to violate Section 1770(a)(7) of the CLRA, because Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices in that they misrepresent the particular standard, quality or grade of the goods.

165. By engaging in the conduct set forth herein, Defendant violated and continues to violate Section 1770(a)(9) of the CLRA, because Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices in that they advertise goods with the intent not to sell the goods as advertised.

166. By engaging in the conduct set forth herein, Defendant has violated and continues to violate Section 1770(a)(16) of the CLRA, because Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices in that they represent that a subject of a transaction has been supplied in accordance with a previous representation when they have not.

167.   Plaintiff request that the Court enjoin Defendant from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to Cal. Civ. Code § 1780(a)(2).   If Defendant is not restrained from engaging in these practices in the future, Plaintiff and the Class will continue to suffer harm.

## SEVENTH CAUSE OF ACTION
### Restitution Based on Unjust Enrichment/Quasi-Contract

168.   Plaintiff incorporates by reference each allegation set forth above.

169.   As a result of Defendant's fraudulent and misleading labeling, advertising, marketing and sales of the Defendant's Misbranded Food Products, Defendant was enriched at the expense of Plaintiff and the Class.

170.   Defendant sold Misbranded Food Products to Plaintiff and the Class that were not capable of being sold or held legally and which were legally worthless.   Plaintiff and the Class paid a premium price for the Misbranded Food Products.

171.   It would be against equity and good conscience to permit Defendant to retain the ill-gotten benefits they received from Plaintiff and the Class, in light of the fact that the products were not what Defendant purported them to be.   Thus, it would be unjust and inequitable for Defendant to retain the benefit without restitution to Plaintiff and the Class of all monies paid to Defendant for the products at issue.

172.   As a direct and proximate result of Defendant's actions, Plaintiff and the Class have suffered damages in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION
### Beverly-Song Act (Cal. Civ. Code § 1790, *et seq.*)

173.   Plaintiff incorporates by reference each allegation set forth above.

174.   Plaintiff and members of the Class are "buyers" as defined by Cal. Civ. Code § 1791(b).

175.   Defendants are "manufacturers" and "sellers" as defined by Cal. Civ. Code § 1791(j) & (l).

176.   Defendant's food products are "consumables" as defined by Cal. Civ. Code §

1    1791(d).

2          177.   Defendant's nutrient and health content claims constitute "express warranties" as

3    defined by Cal. Civ. Code § 1791.2.

4          178.   Defendants, through their package labels, create express warranties by making the

5    affirmation of fact and promising that their Hershey Misbranded Food Products comply with food

6    labeling regulations under federal and California law.

7          179.   Despite Defendant's express warranties regarding their food products, they do not

8    comply with food labeling regulations under federal and California law.

9          180.   Defendants breached their express warranties regarding their Hershey Misbranded

10   Food Products in violation of Cal. Civ. Code § 1790, *et seq.*

11         181.   Defendant sold Plaintiff and members of the Class Hershey Misbranded Food

12   Products that were not capable of being sold or held legally and which were legally worthless.

13   Plaintiff and the Class paid a premium price for the Misbranded Food Products.

14         182.   As a direct and proximate result of Defendant's actions, Plaintiff and the Class have

15   suffered damages in an amount to be proven at trial pursuant to Cal. Civ. Code § 1794.

16         183.   Defendant's breaches of warranty were willful, warranting the recovery of civil

17   penalties pursuant to Cal. Civ. Code § 1794.

18                          **NINTH CAUSE OF ACTION**
19                   **Magnuson-Moss Act (15 U.S.C. § 2301, *et seq.*)**

20         184.   Plaintiff incorporates by reference each allegation set forth above.

21         185.   Plaintiff and members of the Class are "consumers" as defined by 15 U.S.C. §

22   2301(3).

23         186.   Defendant is a "suppliers" and "warrantors" as defined by 15 U.S.C. § 2301(4) &

24   (5).

25         187.   Defendant's food products are "consumer products" as defined by 15 U.S.C. §

26   2301(1).

27         188.   Defendant's nutrient and health content claims constitute "express warranties."

28         189.   Defendant, through its package labels, creates express warranties by making the

1   affirmation of fact and promising that their Defendant's Misbranded Food Products comply with

2   food labeling regulations under federal and California law.

3       190.   Despite Defendant's express warranties regarding its food products, they do not

4   comply with food labeling regulations under federal and California law.

5       191.   Defendant breached its express warranties regarding their Hershey Misbranded

6   Food Products in violation of 15 U.S.C. §§ 2301, *et seq.*

7       192.   Defendant sold Plaintiff and members of the Class Hershey Misbranded Food

8   Products that were not capable of being sold or held legally and which were legally worthless.

9   Plaintiff and the Class paid a premium price for the Misbranded Food Products.

10      193.   As a direct and proximate result of Defendant's actions, Plaintiff and the Class have

11  suffered damages in an amount to be proven at trial.

12  **JURY DEMAND**

13      Plaintiff hereby demands a trial by jury of their claims.

14  **PRAYER FOR RELIEF**

15      WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, and on

16  behalf of the general public, prays for judgment against Defendant as follows:

17      A.    For an order certifying this case as a class action and appointing Plaintiff and his

18  counsel to represent the Class;

19      B.    For an order awarding, as appropriate, damages, restitution or disgorgement to

20  Plaintiff and the Class for all causes of action other than the CLRA, as Plaintiff does not seek

21  monetary relief under the CLRA, but intends to amend her Complaint to seek such relief;

22      C.    For an order requiring Defendant to immediately cease and desist from selling its

23  Misbranded Food Products in violation of law; enjoining Defendant from continuing to market,

24  advertise, distribute, and sell these products in the unlawful manner described herein; and

25  ordering Defendant to engage in corrective action;

26      D.    For all equitable remedies available pursuant to Cal. Civ. Code § 1780;

27      E.    For an order awarding attorneys' fees and costs;

28      F.    For an order awarding punitive damages;

1     G.     For an order awarding pre-and post-judgment interest; and

2     H.     For an order providing such further relief as this Court deems proper.

3

4     Dated:  April 12, 2012.     Respectfully submitted,

5

6     *Ben F. Pierce Gore*

     Ben F. Pierce Gore (SBN 128515)

7     PRATT & ASSOCIATES

     1901 S. Bascom Avenue, Suite 350

8     Campbell, CA  95008

     Telephone:  (408) 429-6506

9     Fax:  (408) 369-0752

     pgore@prattattorneys.com

10

     Jay Nelkin

11     Carol Nelkin

     Stuart M. Nelkin

12     NELKIN & NELKIN, P.C.

     5417 Chaucer Drive

13     P.O. Box 25303

     Houston, Texas 77005

14     Telephone:  (713) 526-4500

     Facsimile:  (713) 526-8915

15     jnelkin@nelkinpc.com

     cnelkin@nelkinpc.com

16     snelkin@nelkinpc.com

17     Don Barrett

     David McMullan, Jr.

18     Brian Herrington

     Katherine B. Riley

19     BARRETT LAW GROUP, P.A.

     P.O. Box 927

20     404 Court Square North

     Lexington, MS 39095

21     Telephone: (662) 834-2488

     Toll Free: (877) 816-4443

22     Fax: (662) 834-2628

     dbarrett@barrettlawgroup.com

23     donbarrettpa@yahoo.com

     bherrington@barrettlawgroup.com

24     kbriley@barrettlawgroup.com

     kbriphone@yahoo.com

25     dmcmullan@barrettlawgroup.com

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Charles Barrett
CHARLES BARRETT, P.C.
6518 Hwy. 100, Suite 210
Nashville, TN 37205
Telephone: (615) 515-3393
Fax: (615) 515-3395
charles@cfbfirm.com

Richard Barrett
LAW OFFICES OF RICHARD R. BARRETT, PLLC
2086 Old Taylor Road, Suite 1011
Oxford, MS 38655
Telephone: (662) 380-5018
Fax: (866) 430-5459
rrb@rrblawfirm.net

J. Price Coleman
COLEMAN LAW FIRM
1100 Tyler Avenue, Suite 102
Oxford, MS 38655
Telephone: (662) 236-0047
Fax: (662) 513-0072
colemanlawfirmpa@bellsouth.net

Dewitt M. Lovelace
Alex Peet
LOVELACE LAW FIRM, P.A.
12870 U.S. Hwy 98 West, Suite 200
Miramar Beach, FL 32550
Telephone: (850) 837-6020
Fax: (850) 837-4093
dml@lovelacelaw.com

David Shelton
ATTORNEY AT LAW
1223 Jackson Avenue East, Suite 202
Oxford, MS 38655
Telephone: (662) 281-1212
Fax: (662) 281-1312
david@davidsheltonpllc.com

Keith M. Fleischman
Frank Karam
Ananda N. Chaudhuri
FLEISCHMAN LAW FIRM
565 Fifth Avenue, 7th Floor
New York, New York 10017
Telephone: 212-880-9571
keith@fleischmanlawfirm.com
frank@fkaramlaw.com
achaudhuri@fleischmanlawfirm.com

*Attorneys for Plaintiff*